## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| In Re: Thomas S. Klein<br><br>      Debtor, | Bankruptcy No. 14-30487<br>Chapter 7 |
| Gene W. Doeling, Trustee,<br><br>      Plaintiff,<br><br>vs.<br><br>Thomas S. Klein,<br><br>      Defendant. | Adversary No. 14-07023 |

## AMENDED MEMORANDUM AND ORDER

### I.      INTRODUCTION

Gene W. Doeling, Chapter 7 Trustee, filed a Complaint seeking a denial of
Debtor/Defendant Thomas S. Klein's discharge under 11 U.S.C. § 727(a)(2), (3) and
(4).  The Trustee alleges that Debtor (1) made certain prepetition transfers with the
intent to hinder, delay or defraud creditors, (2) destroyed or failed to preserve
documents and records from which creditors could ascertain Debtor's financial condition
and (3)  knowingly and fraudulently made false oaths or accounts in connection with this
case.

Debtor filed an Answer to the Complaint, asserting that (1) he did not transfer
assets with intent to hinder, delay or defraud creditors, (2) he has never concealed,
mutilated, falsified or failed to keep information from which his financial condition or
business transactions might be ascertained, unless such act was justified under the
circumstances of this case, and (3) he has been "up-front and honest with the Trustee

1

throughout the bankruptcy process" and amended his schedules when the Trustee requested.

For the following reasons, the Court finds in favor of the Trustee and orders that Debtor is denied a discharge.

**II.    FACTS**

Debtor worked in residential real estate construction in eastern Montana and western North Dakota.  In 2003, he began operating TK Builders, LLC, a Montana company based in Kalispell, Montana.  Debtor was its sole shareholder.  Debtor obtained a license to do business in North Dakota in 2010.

Debtor opened bank accounts in the name of TK Builders at United Community Bank in Minot, North Dakota, and Glacier Bank in Kalispell, Montana.  Debtor used the TK Builders bank accounts and credit cards for personal and business expenditures. His personal expenditures from the TK Builders account included food, clothing, travel (including a trip with his girlfriend to the Kentucky Derby in 2014), automobiles, retirement account contributions, donations to his alma mater and gifts to close friends. Debtor did not keep separate records for his personal and business expenditures. Rather, Debtor provided account summaries at the end of the year to his accountant who Debtor claims segregated his business and personal expenditures.

On January 22, 2014, Debtor consented to entry of judgment in the sum of $491,152.34 in favor of Kurt Larson and against himself, TK Builders and other companies in which Debtor held an interest.  Debtor testified that the claim underlying this judgment arose in 2011.  Debtor made two $50,000 payments on this debt to Larson in 2013.

Debtor also owes Strata Corporation more than $180,000 for invoices dated November 7, 2013, that were due and payable in the spring of 2014 and more than $103,000 for an invoice dated April 24, 2014, due and payable on July 24, 2014.  In addition, Debtor owes Dalyn Vormestrad more than $84,000 for failure to complete a house he contracted to build in May or June 2014.  Ruth Dakota Investment Company, LLC is pursuing a claim against Debtor in the sum of $520,482.52 and Seifhammer, LLC, is pursuing a claim against Debtor in the sum of $197,152.33, both alleging breach of contract causes of action that arose in the summer or fall of 2013.  Debtor owes Falcons Twins, LLC $27,500 for a loan he borrowed in February or March 2014; he owes Eric and Lisa Longecker $51,041.20 for a loan he borrowed in the spring or summer of 2014 and he owes his ex-wife domestic support obligations totaling $60,000 arising from their divorce in June 2014.  Claims filed against Debtor in his bankruptcy case total $3,880,536.24.

In his 2012 tax return, Debtor reported adjusted gross income of -$317,988.00 for Debtor and a net profit or loss of -$480,082.00 for TK Builders.  In his 2013 tax return, Debtor reported adjusted gross income of -$212,481.00 for Debtor and a net profit or loss of -$92,683.00 for TK Builders.

Debtor continued to operate TK Builders until he could no longer find sufficient financing to cover existing liabilities and ongoing projects.  Debtor first considered petitioning for bankruptcy relief in the latter part of July 2014.  He recalls consulting with a bankruptcy attorney on or about July 20, 2014.  He decided to move forward with the bankruptcy filing in August 2014, but did not actually petition for relief under Chapter 7 of the Bankruptcy Code until September 15, 2014.  See Case No. 14-30487.

3

Debtor included schedules with the petition he filed on September 15, 2014.  He amended Schedule F on November 21, 2014, and Schedules B, C, and J, as well as his Statement of Financial Affairs, on December 1, 2014.  Debtor testified that he read these documents before they were filed and understood that he swore under oath that the information provided was true and correct.[1]

Debtor listed TK Builders and its equipment on Schedule B of his initial schedules.[2]  Debtor did not include certain office supplies, office furnishings, miscellaneous tools or certain debt payments on his initial or amended schedules.

The Trustee held the meeting of creditors on October 31, 2014.  At this meeting, Debtor testified under oath.  The Trustee continued the meeting to December 1, 2014.  Debtor testified under oath at the December 2014 meeting as well.  During the December meeting, the Trustee questioned Debtor about his assets, property transfers and other disclosures.  Specifically, the Trustee asked Debtor about assets and transfers not included in his schedules and the Statement of Financial Affairs.  As provided in more detail below, Debtor did not disclose several assets and several asset transfers until prompted by his attorney or until after the Trustee learned about them through independent investigation.

On November 7, 2015, the Trustee filed a petition on behalf of TK Builders under Chapter 7 of the Bankruptcy Code.  On February 26, 2015, the Court consolidated

---

[1] At the meeting of creditors, Debtor testified that he signed the bankruptcy petition.

[2] Debtor valued his ownership interest in TK Builders at $1.00 on his initial schedules.

Debtor's case with the case filed by TK Builders, designating case number 14-30487 as the lead case.

### A. Transfers to Victoria Kieffer

Debtor testified that he and Victoria Kieffer have been in a relationship since the fall of 2007.  Debtor described Kieffer as his "significant other" and expressed his desire to eventually marry and live with Kieffer in Tempe, Arizona.

### 1. Bank Account Transfers to Kieffer

TK Builders hired Kieffer to provide "colorization services" for three separate projects.[3]  TK Builders paid Kieffer for her services on all three projects although two were never completed.  Kieffer has no education or experience in colorization or design. Debtor testified that he chose Kieffer for these services because he was impressed with her colorization work in her own home.

Debtor wrote several checks from the TK Builders bank account to Kieffer from August to December 2013 that he claims were payments to Kieffer for her colorization services.  These transfers included:

| | | |
|---|---|---|
| 1. | Check No. 2122 (August 27, 2013) | $3,000.00 |
| 2. | Check No. 2109 (August 20, 2013) | $5,000.00 |
| 3. | Check No. 2173 (September 23, 2013) | $2,500.00 |
| 4. | Check No. 2222 (October 11, 2013) | $5,000.00 |
| 5. | Check No. 2341 (December 7, 2013) | $5,980.00 |
| | **Total:** | **$21,480.00** |

Debtor did not disclose any of these transfers in his initial or amended schedules.

Neither Kieffer, Debtor nor TK Builders kept a log of the hours Kieffer spent on colorization services.  There is no record of specific work completed beyond generic

---

[3] Debtor described "colorization services" as the planning and choice of color schemes for construction developments.

invoices stating:  "colorization of exterior/interior finishes for [project] and making of colorboards/spec sheets."

## 2.    Bank Account Transfers for Home Renovation Purposes

One or two weeks out of every month, Debtor lives with Kieffer in a house located in Tempe, Arizona.  In the coming months, Debtor plans to move to Tempe to live with Kieffer full time at this Arizona residence.  Neither Kieffer, Debtor nor TK Builders holds an ownership interest in this home.  Rather, Kieffer's parents, Charles and Barbara Lawrence, own the home.

Prior to petitioning for bankruptcy relief, Debtor purchased goods and services with funds from the TK Builders account for improvements to the Kieffers' residence in Tempe, Arizona.  The transactions include:

| | | |
|---|---|---|
| 1. | MTZ Building (garage/pillars) (August 2, 2013) | $7,250.00 |
| 2. | MTZ Building (garage/pillars) (August 20, 2013) | $8,500.00 |
| 3. | Rom-Air (HVAC) (August 21, 2013) | $5,050.00 |
| 4. | Armando Hernandez (landscaping labor) (August 23, 2013) | $8,000.00 |
| 5. | Victoria Kieffer (reimbursement electrical) (August 27, 2013) | $3,000.00 |
| 6. | Touch of Glass (mirrors) (August 27, 2013) | $2,097.12 |
| 7. | Storage Doctor (garage epoxy/cabinets) (August 31, 2013) | $2,739.00 |
| 8. | Arizona Stone (stone veneer) (October 8, 2013) | $4,006.23 |
| 9. | Spas of Arizona (Spa) (October 21, 2013) | $6,777.30 |
| 10. | JBBQ (Barbecue) (October 22, 2013) | $6,502.00 |
| 11. | Armando Hernandez (flooring labor) (November 2, 2013) | $2,500.00 |
| 12. | Keith's Electric (electrical) (November 26, 2013) | $1,110.00 |
| 13. | Victoria Kieffer (reimbursement flooring) (December 17, 2013) | $5,980.00 |
| | **Total:** | **$63,511.65** |

Debtor testified that he received no consideration for the home improvements.  He did not receive any money in exchange for these transfers or reach an agreement to be reimbursed for these improvements.

Debtor did not list any of these transfers in his initial or amended schedules, stating "I guess I didn't think it was needed."  At trial, Debtor explained that he made the

payments as a gesture of commitment to his ongoing relationship with Kieffer and did

not think they were transfers of property or gifts.  Debtor testified that failing to list them

was an oversight.

### 3.    Diamond Earrings

On December 4, 2013, Debtor purchased two half-carat diamond earrings from

R. P. Ellis Fine Jewelry in Missoula, Montana, for $4,200.00.  Debtor gave these

earrings to Kieffer as a Christmas present in December 2013.  Debtor did not list this gift

on his initial Statement of Financial Affairs.  Debtor testified at the meeting of creditors

that he did not think the Statement of Financial Affairs required disclosure of Christmas

gifts.  Debtor explained, "I read everything.  I guess I just overlooked the gift."  Debtor

included the gift of diamond earrings to Kieffer on his amended Statement of Financial

Affairs filed after the meeting of creditors.

### B.    Transfers to Phyllis Topp and Schaefer Farms

Phyllis B. Topp, a longtime family friend of Debtor, loaned $50,000.00 to TK

Builders in 2013.  Debtor and Topp recorded their agreement in a promissory note

dated March 11, 2013, that included a personal guaranty from Debtor.  The promissory

note designated the funds as infrastructure financing for the Oak Park Place project.[4]

As consideration for the loan, the note obligated Debtor to pay Topp or her son, Jay

Topp, the principal, $5,000.00 in total interest plus 2.5 percent of the net profit in the

Oak Park Place project.  The note was due on August 1, 2013.  Debtor renegotiated the

note on August 20, 2013, with identical consideration terms and a new due date of

November 22, 2013.

---

[4] On his Schedule A, Debtor noted that TK Builders owns a one-half interest in
Oak Park Place, and listed a value of $550,000.

Debtor signed a check dated August 26, 2013, for $5,000.00 to Topp as an interest payment on the initial note.  On November 29, 2013, Debtor signed a check for $56,561.80 from the TK Builders bank account to Topp.  The memo section of the check states, "Principal + Interest ($50,000 Plus $1561[.80] Int.)."  Debtor testified that no profit had been realized from the Oak Park Place project.

Schaefer Farms, G.P. loaned $150,000.00 to TK Builders in 2013.  Debtor's sister, Mary Schaefer, is a principal in Schaefer Farms along with her husband and two sons.  Schaefer Farms and Debtor recorded their loan agreement in a promissory note dated March 11, 2013, that included a personal guaranty from Debtor. The promissory note designated the funds as infrastructure financing for the Oak Park Place project.  As consideration for the loan, TK Builders agreed to pay Schaefer Farms principal, $15,000.00 in total interest plus 7.5 percent net profit in the Oak Park Place project. The note was due on August 1, 2013.  Debtor renegotiated the note on August 20, 2013, with identical consideration terms and a new due date of November 22, 2013.

Debtor signed a check dated August 26, 2013, for $15,000.00 to Schaefer Farms as an interest payment on the initial note.  On November 29, 2013, Debtor signed a check for $154,685.40 from the TK Builders bank account to Schaefer Farms.  The memo section of the check reads, "Principal and Interest ($150,000 Plus $4,685[.40] Int.)."  Debtor testified that he obtained the funds used to repay the obligation to Schaefer Farms from a $149,980.00 loan from Timothy J. Ryan.

Debtor did not disclose the $61,561.80 in payments to Topp or $169,685.40 in payments to Schaefer Farms on his Statement of Financial Affairs.  When the Trustee asked Debtor about transfers to friends or relatives at the meeting of creditors, he did

not tell the Trustee about these loan payments.  Debtor testified at trial that he did not disclose these transfers in his Statement of Financial Affairs because he believed they were business debts rather than personal debts.  Each of the four promissory notes executed by Debtor for these transactions includes explicit personal guaranty language and a separate signature block where Debtor signed "Thomas S. Klein, Individually." Notably, Debtor initially disclosed the two $50,000 payments he made toward the satisfaction of Larson's $491,152.34 judgment even though he also considered the debt to Larson to be a business debt.   Larson is his former spouse's cousin.

At the time Debtor made the payments to Topp and Schaefer Farms, Debtor owed $191,322.15 to Strata Corporation pursuant to his personal guaranty of TK Builders' Promise to Pay with Confession of Judgment upon Default.  When asked why he paid the outstanding obligations of Topp and Schaefer Farms rather than Strata Corporation, Debtor responded that the obligation to Strata Corporation was newer than the other two and that the other two creditors had previously extended repayment of their obligations.  Debtor explained that his regular business practice in managing TK Builders was to combine all incoming revenue into one general fund and to pay obligations as they came due from that general fund, rather than apportion funds on a project basis.

### C.    Six Kachina Dolls

Debtor inherited six Kachina dolls from his father in 2009.  Debtor did not disclose the dolls in his initial schedules.  After the meeting of creditors, Debtor included the dolls in his amended schedules, listing a value of $900.  Debtor testified that his failure to list the dolls on his original schedules was an unintentional oversight.  The dolls are currently at Kieffer's residence in Tempe, Arizona.

9

### D.    Pudelpointer and Weimaraner Dogs

Debtor owned two dogs on the day he petitioned for bankruptcy relief, a Weimaraner that Debtor received as a birthday present from his former spouse and daughter in 2008 and a Pudelpointer that Debtor purchased as a puppy for $3,130.50 on December 6, 2011.  The dogs are trained hunting dogs in good health.  Debtor listed a combined value of $50 for both of these dogs in the initial schedules. [5]  Debtor stated that the initial valuation reflected his belief that the dogs' value was principally companionship and difficult to appraise with any precision.  Debtor stated plainly that he would not part with them and intended to include them as exempt property.  Debtor listed a combined value of $1,700 for these two dogs in the amended schedules based on Debtor's post-filing inquiry to a kennel owner about the current price of similar dogs.  Debtor admitted at trial that the market value of two grown hunting dogs of these breeds was much higher than the value he originally scheduled.

### E.    Jewelry

Debtor listed a "ring" and a "gold chain" in Schedule B, declaring a combined value of $2,500.  At trial, Debtor stated that the scheduled value was an approximation based on his understanding of their value at the time he filed his schedules.  Debtor scheduled no other property under the category "[f]urs and jewelry" in the initial schedules.  In his amended schedules, Debtor added a gold bracelet valued at $1,000.00 and changed the value of the gold ring and necklace to "(being appraised) Unknown."

---

[5] At the meeting of creditors, Debtor testified that he purchased the Pudelpointer for approximately $1,500 or $2,000.

### 1.    Gold Ring and Gold Chain Necklace

Debtor inherited the gold ring and necklace from his father in 2009.  Debtor

testified that he had, at some time prior to filing, sought and received an oral appraisal

of the necklace for approximately $1,000.  Debtor retained the necklace, claiming a

$1,000 exemption for it.

Debtor testified that he never had the ring appraised and did not know the true

value.  The ring was 14-karat yellow gold with a center diamond weighing approximately

1.00 carat and sixteen surrounding diamonds with a total carat weight of approximately

2.60 carats.  Precious Gem Appraisal Laboratory Ltd. in Scottsdale, Arizona, appraised

the ring at $9,700.00 for Debtor's father on December 14, 1981.  In response to the

Trustee's assertion at trial that he found the appraisal among Debtor's records, Debtor

admitted to possessing a copy of this appraisal before the filing of the bankruptcy

petition.  Debtor also insured the ring with a Travelers Insurance homeowner's policy

through Smart Insurance Solutions Inc. for $9,700.  The insurance schedule quoted the

exact language on the 1981 appraisal of the ring.

### 2.    Gold Bracelet

Debtor also inherited a gold bracelet from his father in 2009.  The bracelet is 14-

karat gold with 20 diamonds weighing approximately .90 carats combined.  Debtor did

not disclose this asset in his initial schedules.  At the meeting of creditors, the Trustee

asked Debtor "What about bracelets? Do you have any bracelets?" and Debtor

responded, "No."[6]  When the Trustee asked specifically about the bracelet Debtor

---

[6] Debtor wore a bracelet during the meeting of creditors.  It was not the bracelet
he inherited from his father.  The Trustee noticed it and asked about it.  Debtor said that
bracelet was worth about $100.

inherited from his father, Debtor admitted owning the bracelet and that it was at Kieffer's Arizona residence.  When the Trustee asked Debtor why Debtor had not scheduled the gold diamond bracelet, Debtor responded, "I think I overlooked it."  After the meeting of creditors, Debtor listed this asset in the amended schedules at a value of "unknown."  Debtor testified that he had never had the bracelet appraised and had no idea of its true value.  At the request of the Trustee, Knowles Jewelry is offering the bracelet for sale for an appraised cash value price of $1,005.06.

### 3.    Rolex Watch

Debtor purchased an 18-karat yellow gold day-date Rolex Presidential watch on February 5, 2013, for $22,500.00 from R. P. Ellis Fine Jewelry in Missoula, Montana.  In approximately June 2014, Debtor pawned the watch to an unidentified Las Vegas pawn shop for $10,000 to obtain gambling money.  Debtor testified at trial that he does not recall the exact or general location of the pawn shop.  Debtor threw away the documentation regarding this transaction.  Debtor further testified that he did not think his business was failing at the time, despite being "depressed and despondent" that he was unable to pay the creditors of TK Builders.  Debtor admitted that he did not think $10,000 was a fair exchange for the watch.  He testified that he was "heavily intoxicated" and gambled away the proceeds from the sale.  Debtor did not disclose the sale of the watch in his initial or amended Statement of Financial Affairs.

### F.    TKB Development, LLC

Debtor co-owned TKB Development, LLC, an Arizona company, with James R. Bell.  Debtor has known Bell for more than 20 years and described him as a close personal friend.  Debtor worked with Bell for approximately two years in a previous career, and they have remained close friends since that time.

Debtor and Bell formed the Arizona company and began doing business under its name in late 2013 or early 2014. Bell owned 25 to 30 percent of the business. The purpose of the company was to act as a general contractor for the development of residential homes on a plot in Gilbert, Arizona. Debtor transferred $13,228.89 on July 18, 2013, from the TK Builders account to pay attorneys in Arizona for the incorporation of the business. At the meeting of creditors, Debtor stated that he was not listed as an owner or member on the incorporation document but, after the Trustee's persistent questioning, admitted that he was listed as a member. Debtor explained that he believed the business entity had never "come into play" because the company "never ended up doing business transactions or work." Debtor then explained that Bell took Debtor's name off the business because Bell did not "want to have the liability."

Both Debtor and Bell had authority to issue checks from TKB Development's bank account and both handled day-to-day business tasks. Debtor testified that he and Bell did not keep regular records such as income statements, expense statements or meeting minutes. Debtor explained that their only record was a book containing notes on larger transactions because the business did not have many expenses.

Debtor testified that TKB Development did not do any significant business because its clients decided to sell the plot in Gilbert, Arizona, rather than develop it. Debtor elaborated that the business began to falter after this project fell through. The business had no significant assets except for the cash in its account and a small office. Debtor testified that he and Bell decided to wind up the business in "July or August of 2014." Bell withdrew $14,224.29 from the TKB Development bank account on August 13, 2014. Debtor testified that he did not know why Bell withdrew this money and did

not ask.  Debtor assumed that Bell moved the money to Bell's other business.  Debtor

did not object to this withdrawal because he had recently taken a loan from TKB

Development and understood that any remaining equity in the company was Bell's.

Debtor testified that they were "winding up" TKB Development at that time because

Debtor had been contemplating bankruptcy.  Debtor did not receive or request an

accounting from Bell.

Debtor did not list his interest in TKB Development on his initial or amended

schedules.  Debtor explained that he did not think he needed to schedule his interest in

the business because it had not been doing much business and had little value.

### G.   Regal Boat

Debtor owned a 2006 Regal speed boat and boat trailer prior to filing his

bankruptcy petition.  Debtor contracted to sell this boat and the accompanying trailer to

Bell on September 10, 2014, for $20,000.00.  Debtor and Bell signed a bill of sale

documenting the transaction.  Bell paid the purchase price for the boat with two checks,

the first for $5,000.00 immediately after the sale and the other for $15,000.00 in

October, one week before the meeting of creditors.  At trial, Debtor could not recall

whether he and Bell sought an appraisal for the boat's fair market value, but indicated

that they probably had not.[7]

---

[7] At the meeting of creditors, Debtor testified that the fair market value of the boat
was "[r]ight around anywhere from 25,000 to 27,000."  When the Trustee asked Debtor
to explain why he had sold the boat for less than its fair market value, Debtor
responded, "So I could afford to pay my attorney."  Debtor further explained at the
meeting of creditors that he advertised the boat for sale with Century Marine in Mesa,
Arizona, beginning in July 2014.  The boat was listed on contingency for $28,000 to
$29,000, and Debtor estimated that Century Marine would probably charge 15 to 18
percent commission.

Debtor did not list this sale in his initial or amended Statement of Financial Affairs, offering the explanation at trial that the sale had already been completed before he filed for bankruptcy.[8]  On Schedule B of his initial schedules, Debtor listed $17,000.00 in cash, and testified at trial that the $17,000.00 represented the proceeds from the boat sale.  Debtor did not possess the full proceeds until he received the check from Bell in October, but Debtor explained at trial that his attorney advised him to include the boat's proceeds in Schedule B as cash, even though they were technically accounts receivable. Debtor spent the $3,000.00 difference between the sum Debtor received for the boat and the sum listed on Schedule B.

### H.   Donation to the Sun Devil Club of Arizona State University

Debtor donated $5,000.00 to the Sun Devil Club of his alma mater, Arizona State University, on December 31, 2013.  Debtor did not list this transaction on his initial or amended Statement of Financial Affairs.  Debtor also donated $5,000.00 to the Sun Devil Club in 2012.  Debtor stated that he would have continued to make similar gifts but for his business's failure.  Debtor testified at trial that he received nothing in exchange for these donations and that his purpose was purely charitable in nature. Debtor asserts that his failure to list this transfer was an unintentional oversight.  Debtor explained that he thought the payment to the Sun Devil Club was appropriate despite

---

[8] At the meeting of creditors, the Trustee asked Debtor whether he had made a transfer of any interest in property within 90 days before filing for bankruptcy, and Debtor responded, "No."  The Trustee then asked Debtor whether he had transferred any assets to family or friends within the last six years, and Debtor responded, "No." Debtor did not disclose the sale of the boat to Bell until after Debtor's attorney interjected, reminding Debtor of this sale.  At trial, Debtor testified that his failure to list the boat on his Statement of Financial Affairs was an unintentional oversight.

outstanding obligations to creditors because those obligations would not come due for another year.

     **I.**      **Other Omissions from Debtor's Schedules**

On February 5, 2013, Debtor used the TK Builders credit card to purchase a bed set for $2,317.80 for Kieffers' Arizona residence.  Debtor did not disclose this asset on his initial or amended schedules.  Debtor maintains that his failure to list this asset on his initial or amended schedules was an unintentional oversight.

At the time of filing, Debtor owned a life insurance policy through Lincoln Life Insurance.  The policy has no cash value; it merely provides a death benefit for $2,500,000 for its term.  Debtor did not list this term life insurance policy on Schedule B of the initial or amended schedules.  On Schedule J of his initial and amended schedules, Debtor listed a monthly life insurance expense of $152.33.

Debtor testified that he moved a number of office supplies and furnishings from the former office of TK Builders in Montana to a storage shed in Arizona.  On September 22, 2013, Debtor paid United Van Lines $5,868.31 to move these office supplies and furnishings.  Debtor did not list these assets on his initial or amended schedules.  Debtor asserts that his failure to schedule these assets was an unintentional oversight.

On Schedule J of his initial schedules, Debtor listed a monthly "Rental/ Homeownership" expense of $2,104.77.  Debtor testified at the meeting of creditors that the lease for his house in Minot, North Dakota, expired in August.  Debtor admitted that he was no longer making payments under the lease at the time he filed his bankruptcy petition in September.  Rather, Debtor was living part time with Kieffer and part time

with his brother, both residents of Tempe, Arizona.  Debtor removed the rental expense from Schedule J in his amended schedules.

Also on Schedule J of the initial schedules, Debtor listed a monthly "Builder's Risk Insurance" expense of $911.00 in the "Other Insurance" category.  This was not an ongoing expense on the date Debtor petitioned for bankruptcy relief.  The last time Debtor paid this premium was in July 2014.  When the Trustee asked whether Debtor thought it should have been included on his Schedule J, Debtor responded, "Yeah, I guess it shouldn't be."

## III.    CONCLUSIONS OF LAW

### A.    <u>Jurisdiction</u>

This adversary action is a core proceeding under 28 U.S.C. § 157(b)(2)(J).  The Court has jurisdiction under 28 U.S.C. §§ 1334 and 157 and authority to enter a final order in this matter.  This opinion constitutes findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

### B.    <u>Denial of Discharge Standards</u>

In the Complaint, the Trustee seeks a denial of discharge under 11 U.S.C. § 727(a)(2), (a)(3), and (a)(4).  Section 727 of the Bankruptcy Code provides:

(a)    The court shall grant the debtor a discharge, unless . . .

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under [the Bankruptcy Code], has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition;

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account[.]

11 U.S.C. § 727(a).

Denying a debtor a discharge is a harsh remedy.  Kaler v. Charles (In re Charles), 474 B.R. 680, 683 (B.A.P. 8th Cir. 2012); Allred v. Vilhauer (In re Vilhauer), 458 B.R. 511, 514 (B.A.P. 8th Cir. 2011).  Accordingly, courts strictly construe section 727 in favor of the debtor.  In re Vilhauer, 458 B.R. at 514.  While this standard favors debtors, it is also true that a discharge in bankruptcy and the associated fresh start are privileges, not rights.  Bauer v. Iannacone (In re Bauer), 298 B.R. 353, 357 (B.A.P. 8th Cir. 2003) (citing Grogan v. Garner, 498 U.S. 279, 286 (1991)).  "The opportunity for a completely unencumbered new beginning is limited to the honest but unfortunate debtor."  Id.  The cost to the debtor for an unencumbered fresh start is minimal, but it includes honestly and accurately disclosing his or her financial affairs and cooperating with the trustee.  Id.; see also 11 U.S.C. § 521 (listing a debtor's duties in bankruptcy).  "To prevail in an action to deny a debtor's discharge, the objecting party must prove each element under § 727 by a preponderance of the evidence."  In re Charles, 474 B.R. at 683–84 (citing In re Vilhauer, 458 B.R. at 514; Fed. R. Bankr. P. 4005).

**C.   Denial of Discharge Under 11 U.S.C. § 727(a)(4)**

Section 727(a)(4)(A) bars the entry of discharge if a debtor knowingly and fraudulently made a false oath or account in or in connection with a case.  11 U.S.C. §

727(a)(4)(A).  To meet his burden under this subsection, the Trustee must prove that
"(1) Debtor made a statement under oath; (2) the statement was false; (3) Debtor knew
the statement was false; (4) Debtor made the statement with fraudulent intent; and (5)
the statement related materially to Debtor's bankruptcy case."  Lincoln Sav. Bank v.
Freese (In re Freese), 460 B.R. 733, 738 (B.A.P. 8th Cir. 2011) (quotations and citations
omitted).  To prevail in an action seeking denial of discharge, the Trustee must prove
each element by a preponderance of the evidence.  In re Vilhauer, 458 B.R. at 514.

Section 727(a)(4)(A), "requires nothing less than a full and complete disclosure of
any and all apparent interests of any kind."  Korte v. U.S. Internal Revenue Serv. (In re
Korte), 262 B.R. 464, 474 (B.A.P. 8th Cir. 2001) (quotation omitted); Armstrong v.
Lunday (In re Lunday), 100 B.R. 502, 508 (Bankr. D.N.D. 1989) ("A debtor has an
uncompromising duty to disclose whatever ownership interest he holds in property.").
"The debtor's duty of disclosure requires updating schedules as soon as reasonably
practical after he or she becomes aware of any inaccuracies or omissions."  In re Bauer,
298 B.R. at 357.

The proper functioning of the bankruptcy process is dependent upon the debtor
providing complete, accurate and reliable information in the petition and other
documents submitted with the filing of the case so that parties in interest may evaluate
debtors' assets and liabilities and appropriately administer the case.  Jordan v. Bren (In
re Bren), 303 B.R. 610, 613–16 (B.A.P. 8th Cir. 2004), overruled on other grounds by
122 F. App'x 285 (8th Cir. 2005).  Section 727(a)(4)(A) promotes veracity in the
statements and schedules to help prevent creditors and the trustee from resorting to
independent fact-finding and investigation.  Daniel v. Boyd (In re Boyd), 347 B.R. 349,

355 (Bankr. W.D. Ark. 2006).  The disclosure requirement has implications beyond the administration of each individual bankruptcy case because "failure to comply with the requirements of disclosure and veracity necessarily affects the creditors, the application of the Bankruptcy Code, and the public's respect for the bankruptcy system as well as the judicial system as a whole."  In re Korte, 262 B.R. at 474 (quoting Nat'l Am. Ins. Co. v. Guajardo (In re Guajardo), 215 B.R. 739, 742 (Bankr. W.D. Ark. 1997)).

The Trustee argues that Debtor made multiple false oaths in his bankruptcy filings. Specifically, the Trustee alleges that Debtor failed to schedule or disclose the existence and true value of numerous assets and asset transfers.                    .

### a.   Statement under Oath

A debtor's signature on the petition, made under penalty of perjury, is a declaration which has the force and effect of an oath of the kind contemplated by section 727(a)(4)(A).  In re Bren, 303 B.R. at 613; Cepelak v. Sears (In re Sears), 246 B.R. 341, 347 (B.A.P. 8th Cir. 2000) (citation omitted).  Debtor signed his petition.  He testified that he read the schedules and statements before his attorney filed them and understood that he was required to provide truthful and correct information and that the information was provided under oath.  He also testified under oath at the meeting of creditors.  Accordingly, the Court finds that the information in and omissions from his schedules and statements are "statements under oath."  The Trustee satisfied his burden of proof under the first element of section 727(a)(4).  See In re Freese, 460 B.R. at 738-39.

### b.   False Statement that Debtor Knew Was False

The original schedules and statements Debtor filed on September 15, 2014, were not accurate.  Debtor failed to list six Kachina dolls, a gold bracelet, a term life

20

insurance policy from Lincoln Life Insurance and his ownership interest in TKB

Development in the documents he filed in September 2014.  Likewise, he failed to

disclose office supplies and furnishings he moved from TK Builders' business location to

Arizona.  Debtor significantly undervalued his Pudelpointer and Weimereiner dogs and

a gold ring on his original petition.  In addition, he omitted the following transfers and

gifts:  sale of a Rolex watch, payments to Phyllis Topp and Schaefer Farms, a gift of

diamond earrings to Kieffer, payments to Kieffer for colorization services, payments to

Kieffer or third parties for the renovation of a house in Arizona in which he holds no

ownership interest, the sale of the Regal boat to James Bell, his donation to the Sun

Devil Club and a bed for Victoria Kieffer's residence.  Debtor also listed non-existent

expenses on Schedule J of his initial schedules, including a rental expense for his

house in Minot, North Dakota, and a Builder's Risk Insurance expense.

    Debtor knew about the omitted assets and transfers.  Debtor acknowledged his

failure to include these assets and transfers in his original schedules and statements.

He also knew that the estimated value of the dogs and jewelry was low and that he did

not have ongoing expenses for rent or builders risk insurance.  He testified that he read

the schedules and Statement of Financial Affairs and reviewed them before his attorney

filed them.  Accordingly, the Court finds that the Trustee met his burden of proving that

Debtor made false statements he knew were false on the date he signed the petition.

See In re Freese, 460 B.R. at 738–739.

c. Fraudulent Intent

    Debtor maintains that he did not make any transfer of assets with the intent to

hinder, delay or defraud creditors.  Debtor also testified that his statements or omissions

21

were not made with actual fraudulent intent.  He claims that his failure to provide accurate information was due to oversight or misunderstanding.

There is no direct evidence of fraudulent intent in the record.  Nevertheless, the Trustee may establish fraudulent intent with circumstantial evidence.  The Court regards assertions, whether statements or omissions, made with reckless indifference to the truth as the functional equivalent of fraudulent intent.  See In re Geller, 314 B.R. at 807.

Debtor did not disclose the six Kachina dolls or the gold diamond bracelet he inherited in 2009 on the initial schedules but later added them to his amended schedules.  Debtor testified that his failure to schedule the dolls and bracelet was an unintentional oversight that occurred in his haste to file for bankruptcy, but when the Trustee asked Debtor whether he had any bracelets at the meeting of creditors, Debtor responded, "No."  Not until the Trustee inquired about the bracelet Debtor inherited from his father did Debtor admit that he owned this bracelet and that it was stored at Kieffer's Arizona residence.

Debtor undervalued his hunting dogs in his initial schedules.  Debtor asserted that he honestly valued his dogs at $50 because he thought the principal value of his dogs was companionship, which cannot be valued.  Yet, he admitted that he purchased the Pudelpointer as an untrained puppy for $3,130.50.  Debtor also admitted at trial that the fair market value of two grown hunting dogs of the Pudelpointer and Weimaraner breeds is significantly higher than the sum he scheduled, demonstrating that his original valuation was not accurate.  After filing, Debtor exchanged correspondence with a breeder who estimated that the current value of similar doges of the same breed was

22

$1,700 combined.  Later, Debtor amended his schedules to show a value of $1,700 for the dogs.

Debtor undervalued his gold ring.  On the schedules he filed with his petition, Debtor valued his jewelry (which included the gold ring and gold chain necklace but not the gold bracelet) at $2,500.  Debtor claimed that he gave an honest valuation of his jewelry based on the facts he knew at filing.  Debtor explained that he had the necklace orally appraised for $1,000 and asserted that he did not know the true value of the ring because he had not received an appraisal.  Given that he valued both pieces at $2,500, it appears that Debtor valued the ring at $1,500.  At trial, the Court received a copy of an appraisal completed in 1981 showing that the ring was worth $9,700.00.  The appraisal amount and item description listed on the 1981 appraisal was identical to the appraisal amount and item description provided on Debtor's insurance records.  The Court is not persuaded that Debtor's jewelry evaluation was honest.

Debtor did not disclose the June 2014 pawn shop sale of his Rolex watch on his initial Statement of Financial Affairs.  Debtor claims this omission was an oversight, but this explanation as well as the disposition of the watch is suspect.  Debtor did not keep any receipts for this transaction or provide an accounting for the funds other than his testimony that he gambled and lost the $10,000.00 sale proceeds.  Debtor maintains he could not remember the name or even the general location of the Las Vegas pawn shop where he allegedly sold the watch.  He also admitted that $10,000 was not fair consideration for the watch.

Debtor did not disclose the $61,561.80 in payments to Topp or the $169,685.40 in payments to Schaefer Farms on his initial or amended Statement of Financial Affairs,

maintaining that he did not think the Statement of Financial Affairs inquired about business payments.  At the first meeting of creditors, the Trustee asked questions specifically soliciting information about payments to friends or relatives.  After discussing the two $50,000 payments to Larson that Debtor had disclosed on his initial Statement of Financial Affairs, the Trustee asked Debtor whether any other friends or relatives were paid any money during the one-year period before bankruptcy.  The payments to Topp and Schaefer Farms fell within the scope of this inquiry, but Debtor answered "no" to the question.

At trial, Debtor claimed that the payments he made to Topp, Schaefer Farms and Larson related to a business obligation.  The Trustee noted that Debtor had disclosed the payments to Larson (but not the payments to Topp and Schaefer Farms), even though Debtor purportedly believed that the Statement of Financial Affairs had not inquired about business obligations.  Given the size of the transfers to Topp and Schaefer Farms and given that Topp is a close family friend and Mary Schaefer is Debtor's sister, the Court is not convinced that Debtor's failure to disclose the transfers to Topp and Schaefer Farms were "an oversight."

Debtor did not disclose his gift of $4,200 diamond earrings to Kieffer in his initial Statement of Financial Affairs.  Debtor discussed this gift with the Trustee at the meeting of creditors and subsequently listed this transfer in his amended Statement of Financial Affairs.  Despite the specific question on the bankruptcy form, Debtor explained that he thought the Statement of Financial Affairs did not inquire about Christmas gifts.  At trial, he admitted that the Statement of Financial Affairs' disclosure

24

requirement includes Christmas gifts to a girlfriend.  His explanation for this omission is unconvincing.

Debtor did not disclose the payments made to Kieffer from the TK Builders bank account for colorization services in his initial Statement of Financial Affairs.  Debtor explained that he viewed these as business expenses and, therefore, that they were not included within the ambit of the Statement of Financial Affairs' disclosure requirement. Debtor did not include these transfers in his amended Statement of Financial Affairs even after discussing them with the Trustee at the meeting of creditors.

Similarly, Debtor also did not disclose the payments he made to Kieffer and third parties for the renovation of Kieffer's Arizona residence in his initial Statement of Financial Affairs.  When the Trustee asked Debtor why he did not list these transactions at the meeting of creditors, Debtor responded, "I guess I didn't think it was needed." Debtor's explanation that he considered these payments personal expenses and that he made these payments as a contribution to his continuing relationship with Kieffer does not excuse his failure to disclose them.  Debtor and TK Builders were in poor financial condition prior to and after making these payments for colorization services and home improvements.[9]

Debtor did not disclose his ownership interest in TBK Development, claiming that this entity was not doing business and had no value.  A debtor must disclose all assets and transactions, even if the assets are worthless or unavailable to creditors. See

---

[9] In his 2012 tax return, Debtor reported adjusted gross income of -$317,988.00 for Debtor and a net profit/loss of -$480,082.00 for TK Builders.  In his 2013 tax return, Debtor reported adjusted gross income of -$212,481.00 for Debtor and a net profit/loss of -$92,683.00 for TK Builders.

United States v. Canine, 30 Fed. Appx. 678, 679 (8th Cir. 2002); Palatine Nat'l Bank of

Palatine v. Olson (In re Olson), 916 F.2d 481, 484 (8th Cir. 1990); see also Fokkena v.

Peterson (In re Peterson), 356 B.R. 468, 478 (Bankr. N.D. Iowa 2006) ("Debtor has

asserted that several omissions in his bankruptcy filings were de minimis or immaterial.

However, debtors have an 'absolute duty to report whatever interests they hold in

property, even if they believe their assets are worthless.'" (quoting Miller v. Kasden (In

re Kasden), 209 B.R. 239, 243–44 (B.A.P. 8th Cir. 1997)).  The fact that TKB

Development may not have been economically active or may have been valueless is

thus irrelevant to the Bankruptcy Code's disclosure requirements.  Further, Debtor

valued his ownership interest in TK Builders at $1.00 on his initial schedules.  This

disclosure suggests Debtor understood the importance of disclosing his ownership

interest in businesses even if the value of the business interest is de minimis.  Thus,

Debtor's testimony that he did not disclose his interest in TKB Development because it

was valueless appears disingenuous.

      Debtor did not list the sale of the Regal boat to his friend and business partner

James Bell on his initial or amended Statement of Financial Affairs, but he listed the

cash proceeds from the sale on Schedule B of his initial schedules.  At the meeting of

creditors, the Trustee asked Debtor whether he had made a transfer of any interest in

property within 90 days before filing for bankruptcy, and Debtor responded, "No."  The

Trustee then asked Debtor whether he had transferred any assets to family or friends

within the last six years, and Debtor responded, "No."  In fact, Debtor did not disclose

the sale of the boat to Bell until after Debtor's attorney interjected, reminding Debtor of

this sale.

Likewise, Debtor did not disclose the following property on his initial or amended schedules or Statement of Financial Affairs: a $5,000.00 donation to the Sun Devil Club in December 2013, a bed he purchased for $2,317.80 and kept at Kieffer's Arizona residence, a term life insurance policy from Lincoln Life Insurance, and a number of office supplies and furnishings that he moved from the TK Builders' office in Montana to Arizona. Given the number of omissions and the circumstances in this case, Debtor's claim that these omissions were unintentional oversights is not convincing.

Debtor claims that he has been entirely "up-front" and "honest" throughout the entire bankruptcy process. He also claims that the alleged misrepresentations and omissions were not done with fraudulent intent, but rather were oversights or the result of Debtor's misunderstanding of the disclosure requirements. The Court is not convinced. While courts are often understanding of a single omission or error resulting from an innocent mistake, "multiple inaccuracies or falsehoods may rise to the level of reckless indifference to the truth, which is the functional equivalent of intent to deceive." Kaler v. Geller (In re Geller), 314 B.R. 800, 807 (Bankr. D.N.D. 2004) (citing In re Bren, 314 B.R. at 614). In this regard, "the existence of multiple falsehoods, taken together with a failure on the part of the debtor to correct all known inconsistencies, omissions, and misstatements upon first amendment, constitutes reckless indifference to the truth and, thus, the requisite intent to deceive." Kaler v. McLaren (In re McLaren), 236 B.R. 882, 895 (Bankr. D.N.D. 1999) (citing Beaubouef v. Beaubouef (In re Beaubouef), 996 F.2d 174 (5th Cir. 1992); Oldendorf v. Buckman, 173 B.R. 99 (E.D. La. 1994)).

As outlined above, Debtor omitted numerous assets and transfers from his schedules and statements and undervalued several of the assets disclosed, which—given the number of errors and the sum of money involved—shows reckless indifference to the truth.  Even more troubling than the number of omissions and inaccuracies is the evidence showing that Debtor failed to disclose assets that held special value to him or benefited family and friends.  Debtor inherited the ring, bracelet, gold necklace and Kachina dolls from his father in 2009.  Debtor stated plainly that he would not part with them and intended to include them as exempt property.  Except for the sale of the Rolex watch (an explanation that gives the Court pause given the inability to verify the disposition of proceeds), most of the alleged transfers of property were made to benefit Debtor's girlfriend, family, close friends or alma mater.

Debtor made a number of misstatements or omissions in his filings or in the course of bankruptcy proceedings that demonstrate Debtor's lack of "utmost honesty and candor" in completing or reviewing the filings.  See In re McLaren, 236 B.R. 894–95.  Additionally, Debtor failed to include many of the property interests or transactions at issue in his amended schedules, even after the Trustee addressed them at the meeting of creditors.

Accordingly, the Court finds that the Trustee met his burden of showing, by a preponderance of the evidence, that Debtor acted with actual fraudulent intent by misstating or omitting: the six Kachina dolls, the value of his dogs, the value or existence of Debtor's gold ring and diamond and gold bracelet, the sale of the Rolex watch and boat, transfers to Topp and to Schaefer Farms, the gift and transfers to Victoria Kieffer, the payments to Victoria Kieffer and third parties for the renovation of a

28

residence owned by her parents, the donation to the Sun Devil Club and Debtor's interest in TKB Development.

d.   <u>Materiality</u>

A statement is material under 11 U.S.C. § 727(a)(4)(A) if it relates to or concerns the debtor's business transactions, the debtor's business or personal estate, the discovery of assets, or the existence or disposition of the debtor's property.  <u>Merty v. Rott</u>, 955 F.2d 596 (8th Cir. 1992); <u>In re Grimlie</u>, 439 B.R. 710, 717 (B.A.P. 8th Cir. 2010).  All of the omissions of the property interests or transactions from the initial schedules concerned Debtor's personal estate, the discovery of assets, the existence of Debtor's property and the disposition of Debtor's property.  Additionally, the payments Debtor made to Topp, Schaefer Farms, and Kieffer for consulting services related to Debtor's business transactions and business estate.  Therefore, the omissions or misrepresentations in the initial schedules were material.  Accordingly, the Court holds that the Trustee met his burden of proof on each element of the section 727(a)(4)(A) claim.

The Court considered all other arguments and deems them to be without merit.

## IV.   CONCLUSION

For the reasons stated above, Debtor's discharge is denied under 11 U.S.C. §727(a)(4)(A).  Because the Court denies Debtor's discharge under this section, the Court finds it unnecessary to decide whether he should also be denied a discharge under 11 U.S.C. § 727(a)(2) even though there is a great deal of evidence to support this claim as well.  Likewise, the Court finds it unnecessary to analyze the Trustee's claim under 11 U.S.C. § 727(a)(3).

**JUDGMENT MAY BE ENTERED ACCORDINGLY.**

Dated:  January 21, 2016.

SHON HASTINGS, JUDGE
UNITED STATES BANKRUPTCY COURT